Approved:     CARRIE H. COHEN/HOWARD S. MASTER/ANDREW D. GOLDSTEIN
              Assistant United States Attorneys

Before:       THE HONORABLE FRANK MAAS
              United States Magistrate Judge
              Southern District of New York

- - - - - - - - - - - - - - - x
                                :
UNITED STATES OF AMERICA        :        SEALED COMPLAINT
                                :
        - v. -                  :        Violations of
                                :        18 U.S.C. §§ 1341, 1343,
                                :        1346, 1349, and 1951
SHELDON SILVER,                 :
                                :        COUNTY OF OFFENSE:
            Defendant.          :        NEW YORK
                                :
- - - - - - - - - - - - - - - X

SOUTHERN DISTRICT OF NEW YORK, ss.:

        ROBERT W. RYAN, being duly sworn, deposes and says that
he is a Criminal Investigator with the United States Attorney's
Office for the Southern District of New York, and charges as follows:

## COUNT ONE

        1.    From at least in or about 2000, up to and including
the date of this Complaint, in the Southern District of New York and
elsewhere, SHELDON SILVER, the defendant, willfully and knowingly,
having devised and intending to devise a scheme and artifice to
defraud, and to deprive the public of its intangible right to SILVER's
honest services as an elected legislator and as the Speaker of the
New York State Assembly, would and did transmit and cause to be
transmitted by means of wire communication in interstate and foreign
commerce, writings, signs, signals, pictures, and sounds for the
purpose of executing such scheme and artifice, to wit, SILVER used
the power and influence of his official position to obtain for himself
millions of dollars in bribes and kickbacks masked as legitimate
income earned by SILVER as a private lawyer.

        (Title 18, United States Code, Sections 1343 and 1346.)

**COUNT TWO**

2.     From at least in or about 2000, up to and including the date of this Complaint, in the Southern District of New York and elsewhere, SHELDON SILVER, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and to deprive the public of its intangible right to SILVER's honest services as an elected legislator and as the Speaker of the New York State Assembly, for the purpose of executing such scheme and artifice and attempting to do so, placed in a post office and authorized depository for mail matter, a matter and thing to be sent and delivered by the Postal Service and deposited and caused to be deposited a matter and thing to be sent and delivered by private and commercial interstate carrier, and took and received therefrom, such matter and thing, and knowingly caused to be delivered by mail and such carrier according to the direction thereon, such matter and thing, to wit, SILVER used the power and influence of his official position to obtain for himself millions of dollars in bribes and kickbacks masked as legitimate income earned by SILVER as a private lawyer.

(Title 18, United States Code, Sections 1341 and 1346.)

**COUNT THREE**

3.     From at least in or about 2000, up to and including the date of this Complaint, in the Southern District of New York and elsewhere, SHELDON SILVER, the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit honest services mail fraud in violation of Title 18, United States Code, Sections 1341 and 1346.

4.     It was a part and an object of the conspiracy that SHELDON SILVER, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and to deprive the public of its intangible right to SILVER's honest services as an elected legislator and as the Speaker of the New York State Assembly, for the purpose of executing such scheme and artifice and attempting to do so, placed in a post office and authorized depository for mail matter, a matter and thing to be sent and delivered by the Postal Service and deposited and caused to be deposited a matter and thing to be sent and delivered by private and

commercial interstate carrier, and took and received therefrom, such matter and thing, and knowingly caused to be delivered by mail and such carrier according to the direction thereon, such matter and thing, in violation of Title 18, United States Code, Sections 1341 and 1346, to wit, SILVER agreed with others known and unknown, including a co-conspirator not named herein ("CC-1"), to use the power and influence of his official position to induce certain real estate developers with significant business before the State of New York to retain the law firm of CC-1 in exchange for hundreds of thousands of dollars in secret bribes and kickbacks paid to SILVER by the law firm, which were masked as legitimate income earned by SILVER as a private lawyer.

(Title 18, United States Code, Section 1349.)

### COUNT FOUR

5.    From at least in or about 2000, up to and including the date of this Complaint, in the Southern District of New York and elsewhere, SHELDON SILVER, the defendant, willfully and knowingly, did obstruct, delay, and affect in any way and degree commerce, and the movement of articles and commodities in commerce, by extortion, as those terms are defined in Title 18, United States Code, Section 1951, and did thereby obtain property not due SILVER or his office and to which SILVER was not entitled, under color of official right, to wit, SILVER used the power and influence of his official position to obtain for himself millions of dollars masked as legitimate income earned by SILVER as a private lawyer.

(Title 18, United States Code, Section 1951.)

### COUNT FIVE

6.    From at least in or about 2000, up to and including the date of this Complaint, in the Southern District of New York and elsewhere, SHELDON SILVER, the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to willfully and knowingly obstruct, delay, and affect in any way and degree commerce, and the movement of articles and commodities in commerce, by extortion, as those terms are defined in Title 18, United States Code, Section 1951, and did thereby obtain property not due SILVER or his office and to which SILVER was not entitled, under color of official right, to wit,

SILVER agreed with others known and unknown, including CC-1, to use the power and influence of his official position to obtain for himself hundreds of thousands of dollars masked as legitimate income earned by SILVER as a private lawyer.

(Title 18, United States Code, Section 1951.)

The bases for deponent's knowledge and for the foregoing charges are, in part, as follows:

7.    I am a Criminal Investigator with the United States Attorney's Office for the Southern District of New York ("USAO SDNY"), and have been in that position for approximately eight years. I have been personally involved in the investigation of this matter along with Special Agents of the Federal Bureau of Investigation (the "FBI") and other Criminal Investigators of the USAO SDNY (collectively, the "Investigative Team"). Previously, I was a Special Agent of the U.S. Department of Housing and Urban Development - Office of the Inspector General ("HUD-OIG") for three years, and prior to that I was a Special Agent of the Internal Revenue Service - Criminal Investigation ("IRS-CI") for 14 years. While with the USAO SDNY, HUD-OIG, and IRS-CI, I have participated in multiple investigations of public corruption offenses, among other offenses.

8.    I am familiar with the facts and circumstances set forth below from my participation in the investigation of this matter, from my personal knowledge, and from my conversations with other law enforcement officers, including members of the Investigative Team and others. Because this Affidavit is being submitted for the limited purpose of establishing probable cause, I have not included every fact I have learned during the investigation. Where the actions, statements, and conversations of others are recounted herein, they are related in substance and in part, unless otherwise indicated.

## OVERVIEW

9.    SHELDON SILVER, the defendant, has engaged in and continues to engage in a secret and corrupt scheme to deprive the citizens of the State of New York (the "State") of his honest services, and to extort individuals and entities under color of official right, as an elected legislator and as Speaker of the New York State Assembly (the "Assembly"). For more than a decade, SILVER repeatedly has represented publicly that his outside income as a private lawyer is derived from private citizens who seek him out for legal services in personal injury matters, and that none of his

4

clients has any business before the State.  SILVER also has represented through the State's mandatory financial disclosure filings that he derives his outside income as a private lawyer from "representing individual clients" in "personal injury actions" as "of counsel" to the law firm Weitz & Luxenberg, P.C. ("Weitz & Luxenberg").  These representations were and are materially false and misleading.  In truth and in fact, SILVER has obtained millions of dollars in outside income as a direct result of his corrupt use of his official position to obtain attorney referral fees for himself, including from clients with substantial business before the State, and not as a result of legitimate outside income SILVER earned as a private lawyer.

         10.  The investigation to date has revealed that SHELDON SILVER, the defendant, received more than $6 million in outside income from two law firms since late 2002, consisting of the following:

         a.  Approximately $700,000 in undisclosed bribes and kickbacks obtained in a scheme described in detail below, whereby SILVER used his power and influence as an elected legislator and as Speaker of the Assembly to induce real estate developers with business before the State to retain and continue to use a real estate law firm (the "Real Estate Law Firm") controlled by an attorney who previously had worked as SILVER's counsel in the Assembly ("CC-1"), and who caused SILVER to be paid for such referrals by the Real Estate Law Firm.

         b.  More than $5.3 million in payments from Weitz & Luxenberg in the form of: (i) a salary of approximately $120,000 annually, totaling more than $1.4 million during the relevant time period, which SILVER received based on his official position rather than any work he was expected to perform for clients of the firm, plus (ii) approximately $3.9 million in attorney referral fees, over $3 million of which SILVER obtained through a corrupt scheme described in greater detail below, whereby SILVER obtained referrals of asbestos cases from a doctor ("Doctor-1") by using his official position to secretly direct $500,000 in State funds to Doctor-1's research and provide additional benefits to Doctor-1 and his family.

         11.  SHELDON SILVER, the defendant, had no involvement in the work of the Real Estate Law Firm or Weitz & Luxenberg's asbestos practice, and he has never performed any legal work whatsoever for either the Real Estate Law Firm's real estate developer clients or Weitz & Luxenberg's asbestos clients.  In short, as set forth below,

there is probable cause to believe that SILVER obtained approximately $4 million in payments characterized as attorney referral fees solely through the corrupt use of his official position.

12.   When, in or about 2013, the Moreland Commission to Investigate Public Corruption (the "Moreland Commission") began to investigate outside income earned by SHELDON SILVER, the defendant, and other State legislators, SILVER took legal action and other steps to prevent the disclosure of such information to the Moreland Commission.

## BACKGROUND

### *The Legislature and*
### *Silver's Authority and Compensation as Assembly Speaker*

13.   I have learned the following from my review of publicly available State government documents, and my training, experience, and participation in the investigation:

a.   The New York State Legislature (the "Legislature") is seated in the State Capitol in Albany.  As provided for in Article III of the New York State Constitution and State law, the Legislature consists of two houses: the Assembly, which has 150 elected members, and the State Senate (the "Senate"), which has 63 elected members.  The leader of the Assembly, who is elected by its members, is referred to as the Speaker of the Assembly.

b.   Members of the Legislature generally are permitted to hold outside employment and earn outside income at the same time they serve as legislators.  However, because of the obvious potential for abuse that arises when members of the Legislature receive outside income, State law restricts to some degree such employment to avoid, among other things, conflicts and potential conflicts of interest.  Additionally, as discussed in greater detail below, State law requires members of the Legislature to disclose annually certain information about their outside income, including the sources of that income.

c.   In or about 1976, SHELDON SILVER, the defendant, was elected as a member of the Assembly in an Assembly District that comprises much of lower Manhattan.  In or about 1994, SILVER was elected Speaker of the Assembly, a position he continues to hold more than two decades later.

d.     Pursuant to the Rules of the Assembly and other provisions of State law and practice, the Speaker of the Assembly has significant power over the Assembly, including appointing the chairperson and members of all Assembly committees, creating subcommittees and task forces and appointing the chairperson and members thereof, overseeing the Assembly's rules and regulations, presiding over the Assembly, and controlling legislative sessions, including bringing certain legislation to the floor for debate.   In addition, the Speaker of the Assembly plays a key role in negotiation of the State budget and the allocation of certain State funds to various entities.

e.     As a member of the Assembly, SILVER is paid the same annual base salary as other Assembly members, which currently is $79,500.   In addition to his base salary, SILVER is paid an additional salary of $41,500 for serving as Speaker of the Assembly. Accordingly, SILVER's total annual monetary compensation for his official duties is $121,000, plus per diem pay, a car and driver, and travel reimbursement.

### *Silver's Power and Influence Over the Real Estate Industry and Health Care Funding*

#### The Real Estate Industry

14.    I have learned the following about the role of SHELDON SILVER, the defendant, in regulating the State's real estate industry from individuals who are in the business of lobbying State elected officials on behalf of, among other entities, a New York-based real estate developer ("Developer-1") (the "Lobbyists"), a representative from Developer-1, representatives of another New York-based real estate developer ("Developer-2"), records obtained from the Moreland Commission after the Governor of the State disbanded it as described in greater detail below, public records, and my training, experience, and participation in the investigation:

a.     The Legislature, including the Assembly, has a significant role in regulating the real estate industry in the State. In particular, the Legislature regulates the real estate industry by, among other things, passing laws governing real estate taxation, rent, land use, and other matters.   In addition to controlling key aspects of real estate regulation, the State also sponsors and provides governmental subsidies and tax incentives that have significant financial value to certain participants in the real estate industry.   Among other programs of this nature are (i) a

program known as the "80/20 program," under which qualifying
developers of residential rental real estate are eligible for
government-subsidized financing and tax credits, in exchange for
keeping at least 20 percent of units affordable for low and moderate
income renters for a set period of time, and (ii) a program known
as the "421-a program" under which substantial real estate tax
abatements are provided for certain new residential real estate
developments.   Several of these regulations and programs, in
particular those relating to rent regulation and tax abatements,
expire periodically and thus must be renegotiated and reapproved by
the Legislature, including the Assembly, if they are to continue.

             b.    In part due to the importance of the Legislature
to the real estate industry, real estate developers, including
Developer-1, are some of the largest contributors to campaigns of
candidates for State office and to political committees controlled
by leaders of the Legislature, including SILVER.   For example, I have
learned that from in or about 2005 through in or about 2014,
Developer-1 has contributed more than $10 million to candidates for
State office and State political committees, including to committees
of both major political parties, making it the largest political
contributor of any person or entity to State candidates or committees
during that time period.   Developer-1's more than $10 million in
contributions includes approximately $200,000 to SILVER and a
political committee SILVER controls.

             c.    Real estate developers and associations of real
estate developers also retain lobbyists to lobby legislators,
including SILVER, among others, in order to ensure that their
interests are represented effectively before SILVER and other key
decision makers in State government.   For example, in or about 2014,
Developer-1 paid approximately $900,000 to eight different
lobbyists, including the Lobbyists, to lobby State government
officials, including SILVER.

                        Health Care Funding

             15.   I have learned the following from my review of
publicly available State government documents, individuals
currently or formerly employed by the New York State Department of
Health ("DOH"), and my training, experience, and participation in
the investigation:

             a.    SHELDON SILVER, the defendant, has exercised,
and continues to exercise, control over several sources of State

8

funding as Speaker of the Assembly.   Funding that SILVER has
controlled since becoming Speaker of the Assembly includes
discretionary money that is allocated to the Assembly for use by its
members ("member items"), and capital funding through certain State
public authorities that is available to projects backed by SILVER.
In addition to general-purpose member item funding and capital
funding, discretionary funds over which SILVER has exercised control
include funding available to the Assembly until in or about 2007 under
legislation entitled the New York State Health Care Reform Act
("HCRA").[1]   Specifically, until in or about 2007, up to $8.5 million
was allocated to the Assembly annually under HCRA, to be disbursed
through DOH at the discretion of the Speaker of the Assembly, i.e.,
SILVER (the "HCRA-Assembly Pool").

      b.   Until in or about April 2005, the HCRA-Assembly
Pool was not part of the State budget, and disbursements from the
HCRA-Assembly Pool were not disclosed in the budget.   Beginning in
or about April 2005 through in or about 2007, the HCRA-Assembly Pool
was included in the State budget, but it was listed as a lump sum
$8.5 million line item, without any public disclosure of the
recipients of the funds from the HCRA-Assembly Pool or the purported
intended use of such funds.

      c.   To disburse funds from the HCRA-Assembly Pool,
a letter from SILVER was sent to DOH, accompanied by a form called
a Legislative Initiative Form, which provided the purported intended
purpose of the disbursement.   DOH had no role in selecting recipients
of the HCRA-Assembly Pool funds or evaluating the intended use of
such funds.   Grants from the HCRA-Assembly Pool differed from other
grants that DOH has administered in certain limited research areas,
which are subject to a formal application process and peer review.
Thus, SILVER was able to distribute money from the HCRA-Assembly Pool
at his discretion, with no public disclosure of the disbursements.

      d.   In or about January 2007, the State, to increase
transparency about the spending of State funds, adopted legislation
called the Budget Reform Act of 2007 prohibiting "lump-sum"
appropriations by the Legislature, such as the HCRA-Assembly Pool.
Instead, any discretionary appropriations added to the budget by the
Legislature had to be itemized appropriations that, unlike
expenditures made from the HCRA-Assembly Pool, had to be publicly
disclosed.   Pursuant to the Budget Reform Act of 2007 and as a

---

[1] Pub. Health L. § 2807-L(1)(c)(iii)(B).

9

cost-saving measure, the HCRA-Assembly Pool was abolished and was no longer available after 2007.

## SILVER'S PUBLIC REPRESENTATIONS ABOUT HIS OUTSIDE INCOME

16.   I have learned the following from records obtained from the New York State Legislative Ethics Commission (the "Ethics Commission"), public records, and my training, experience, and participation in the investigation:

a.   Pursuant to the New York State Public Officers Law, members of the Legislature are required to file financial disclosure statements on an annual basis with the Ethics Commission. The financial disclosure statement is entitled "Annual Statement of Financial Disclosure" (the "Disclosure Form") and is required to be signed and presented for filing by the reporting individual.

b.   A primary purpose of the Disclosure Form is to require legislators to disclose outside income, activities, finances, and assets that may indicate a financial impropriety or conflict of interest.

c.   The Disclosure Form requires reporting individuals to answer a variety of questions about themselves and their spouses related to, among other things, outside employment and income, involvement with not-for-profit corporations and political parties, investments, assets, loans, gifts, and reimbursements. Beginning in or about 2013, the Disclosure Forms have been posted on the Internet by the New York State Joint Commission on Public Ethics and available to the general public.

d.   If a Disclosure Form is offered or presented that knowingly contains a false statement or false information, it may serve as the basis for prosecution under the New York Penal Law.[2]

e.   At all times relevant to this Complaint, the Disclosure Form required reporting individuals to answer the following questions "completely," among others:

i.   Question No. 8 required reporting individuals who also are attorneys to give a "general description of the principal subject areas" of their practice.

---

[2] See, e.g., N.Y. Penal Law § 175.30 (offering a false instrument for filing in the second degree).

           ii.    Question No. 13 required reporting individuals to list the "nature and amount of any income in EXCESS of $1,000 from EACH SOURCE." (Emphasis in original.)

           f.    As he was required to do, SHELDON SILVER, the defendant, filed Disclosure Forms with the Ethics Commission on an annual basis.  For the calendar years 2002-2013, SILVER provided the following answers to Questions 8 and 13 on his Disclosure Forms:

| | Question 8 | | Question 13 | |
| Year | "General Description of the Principal Subject Areas" of Practice | Source of Income | Nature of Income | Amount of Income |
|---|---|---|---|---|
| 2002 | "Limited practice of law in the principal subject area of personal injury claims on behalf of individual clients.   Since September 2002, of counsel to law firm." | "Law Practice"<br><br>"of counsel practice Weitz & Luxenberg" | "Fees"<br><br>"Fees" | $20,000 to under $60,000<br><br>$20,000 to under $60,000 |
| 2003 | "Limited practice of law in the principal subject area of personal injury claims on behalf of individual clients and of counsel to law firm." | "Weitz & Luxenberg of Counsel" | "Fees" | $100,000 to under $250,000 |
| 2004 | [same as 2003] | [same as 2003] | "Fees" | $100,000 to under $250,000 |
| 2005 | [same as 2003 and 2004] | [same as 2003 and 2004] | "Fees" | $250,000 or over |
| 2006 | [same as 2003-2005] | [same as 2003-2005] | "Fees" | $250,000 or over |
| 2007 | "Limited to practice of law in the principal subject area of personal injury claims on behalf of individual clients and of counsel to law firm." | "Weitz & Luxenberg" | "Fees" | $250,000 or over |
| 2008 | [same as 2007] | [same as 2007] | "Fees" | $250,000 or over |
| 2009 | "Limited practice of law in the predominant area of personal injury claims on behalf of individual clients and of counsel to law firm." | "Law Practice (including Weitz & Luxenberg)" | "Fees" | $250,000 or over |
| 2010 | [same as 2009] | "Law Practice" | "Including of Counsel to W&L Esq." | $250,000 or over |
| 2011 | "General practice of law with emphasis on representation of individual clients and personal injury actions and of counsel to law firm." | "Law Practice" | "Including of Counsel to W&L Esq." | $250,000 or over |
| 2012 | "General practice of law with emphasis on representation of individual clients and personal injury actions and 'of counsel' to law firm." | "Law Practice" | "Including of Counsel to W&L" | $350,000 to under $450,000[3] |
| 2013 | [same as 2012] | "Law Practice" | "Including of Counsel of W&L" | $650,000 to under $750,000 |

17.    As reflected above, from the beginning of his employment as "of counsel" to Weitz & Luxenberg in 2002 through 2008, the only source of income from the practice of law reported by SHELDON

---

[3] 2012 was the first year for which the Disclosure Forms required income exceeding $250,000 to be further broken down.

SILVER, the defendant, was "fees" received from Weitz & Luxenberg. Beginning with his 2009 Disclosure Form, which was filed with the Ethics Commission in or about May 2010, SILVER described the source of his legal income as "Law Practice," and noted that such source "includ[ed]" being of counsel to Weitz & Luxenberg.   In no year from 2002 through 2013 did SILVER report that he received income from the Real Estate Law Firm or from any law firm other than Weitz & Luxenberg.

18.   Based on my review of an analysis by the Moreland Commission of disclosures by SHELDON SILVER, the defendant, and other members of the Legislature, SILVER reported more outside income from the practice of law than any other member of the Legislature in calendar year 2012, the first year for which the Disclosure Forms required a more detailed breakdown of outside income exceeding $250,000.

19.   I have learned the following from my review of public statements made by SHELDON SILVER, the defendant, as well as statements made by SILVER's official spokesperson, who has confirmed that his representations to the public about SILVER's outside income were accurately reported and based on information provided to him by SILVER:

a.   SILVER has claimed publicly that his private legal work consists of spending several hours each week evaluating legal matters brought to him by potential clients and then referring cases that appear to have merit to attorneys at Weitz & Luxenberg.

b.   SILVER has stated that he represents "plain, ordinary simple people."

c.   SILVER's spokesman recently stated that potential clients find SILVER by virtue of his being a "lawyer for more than 40 years," and that SILVER's ability to find clients was "not unlike any other attorney in this state, anywhere."

d.   SILVER further has insisted publicly on numerous occasions that his legal work has no connection to his official position or to State government, and SILVER's official spokesperson recently stated that "[n]one of [SILVER'S] clients have any business before the state."   SILVER never has acknowledged publicly receiving any money from a real estate law firm or providing any sort of representation in real estate matters.   Nor has SILVER publicly acknowledged receiving any money from asbestos matters specifically.

13

## THE INVESTIGATION OF SILVER'S OUTSIDE INCOME FROM LAW FIRMS

20.   Based on information obtained from, among other sources, the Investigative Team's prior investigations of corruption by members of the Legislature, cooperating witnesses related to those investigations, and review of public disclosures and statements by SHELDON SILVER, the defendant, a grand jury investigation was initiated concerning the outside income of SHELDON SILVER, the defendant, in or about June 2013.   In connection with that investigation, the Investigative Team has, among other things, obtained documents and witness statements voluntarily and pursuant to grand jury subpoena; reviewed public records; obtained and reviewed material from the Moreland Commission under circumstances described below; and conducted analyses of these records.

21.   In light of the fact that SHELDON SILVER, the defendant, reported to the Ethics Commission in his Disclosure Forms that he had earned hundreds of thousands of dollars in legal fees from a practice with a "predominant" or "principal" emphasis on "personal injury claims on behalf of individual clients," I and other members of the Investigative Team conducted searches on government databases that report on cases litigated in State and federal courts to identify cases in which SILVER had entered an appearance as an attorney from in or about 2002 to the present.   This research identified no cases in which SILVER had entered an appearance as a lawyer.

22.   In order to investigate the sources of outside income paid to SHELDON SILVER, the defendant, I obtained documents from Weitz & Luxenberg pursuant to grand jury subpoena and learned the following:

a.     Weitz & Luxenberg paid SHELDON SILVER, the defendant, a base salary of approximately $120,000 annually.

b.     SILVER received millions of dollars in referral fees from Weitz & Luxenberg.  Records reflect that SILVER was credited with referring more than 100 clients to the firm, the majority of which were referred for potential asbestos litigation, rather than negligence or other types of personal injury litigation as SILVER had claimed publicly.[4]

---

[4] I have reviewed Weitz & Luxenberg's website, which distinguishes asbestos cases – a type of products liability case – from "personal injury and malpractice" cases.

    c. The USAO SDNY's grand jury subpoena sought records related to work actually performed by SILVER for Weitz & Luxenberg.  That request resulted in production of documents related to a single property dispute in which SILVER, along with other Weitz & Luxenberg attorneys, represented an individual who I learned through public records was employed by the Legislature.  SILVER did not earn fees of any kind for that representation.

    d. Weitz & Luxenberg paid SILVER more than $3.2 million in referral fees from 2003 through in or about November 2014 for asbestos cases that SILVER was credited with referring to Weitz & Luxenberg, compared to less than $650,000 in referral fees for all other matters (specifically, negligence/personal injury and motor vehicle accident cases) that he was credited with referring to the firm.

    23. Following receipt of the above information, I, along with other members of the Investigative Team, attempted to contact asbestos clients of Weitz & Luxenberg for whom SHELDON SILVER, the defendant, received referral fee credit.  If the clients were deceased, we attempted to contact surviving family members who might be aware of the circumstances under which Weitz & Luxenberg was retained.  The Investigative Team spoke to more than ten such individuals and learned the following:

    a. None of the asbestos clients and/or surviving family members had ever contacted SILVER to seek legal representation or for any other purpose, nor had they ever been contacted by SILVER. No asbestos client and/or surviving family member was aware of any role played by SILVER in providing legal services to himself or herself or a family member.

    b. Several asbestos clients and/or surviving family members identified Doctor-1, who specializes in treating patients suffering from an asbestos-related cancer called mesothelioma and works at a University in Manhattan ("University-1"), as a treating physician.  Several of these individuals also stated that Doctor-1 had recommended that they or their family member retain Weitz & Luxenberg.  One patient of Doctor-1 who retained Weitz & Luxenberg recalled that Doctor-1 had referenced his relationship with SILVER in recommending Weitz & Luxenberg, but that patient also stated he had never spoken with SILVER and SILVER played no known role in evaluating his case or representing him.

c.    Several of the clients and surviving family members reside in states other than New York.   After clients retained Weitz & Luxenberg, they engaged in regular contact with the firm by interstate telephone calls (with respect to the out-of-state clients) and by United States mail and/or a private overnight mail carrier.   The firm provided and requested frequent mailings concerning intake information, case status, and payments.

24.   Based on records provided by Weitz & Luxenberg, I learned that certain payments to SHELDON SILVER, the defendant, from Weitz & Luxenberg were made to a bank account in the name of "Sheldon Silver, Esq."   I and other members of the Investigative Team obtained and reviewed records relating to this account and learned that, in addition to depositing payments from Weitz & Luxenberg into that account, SILVER deposited hundreds of thousands of dollars in payments from the Real Estate Law Firm into the account.

25.   After identifying the additional source of income that SHELDON SILVER, the defendant, obtained from the Real Estate Law Firm, the Investigative Team obtained and reviewed records of the Real Estate Law Firm concerning the payments that the Real Estate Law Firm made to SILVER.   Those records reflected that from at least in or about 2004 through in or about December 2014, SILVER was paid nearly $700,000 from the Real Estate Law Firm in what were described as "referral fees" attributed to SILVER's referral of Developer-1 and Developer-2 to the Real Estate Law Firm.[5]

26.   Based on my review of a preliminary analysis of the records described above, I have determined that SHELDON SILVER, the defendant, received a total of more than $6 million in outside income from 2002 to the present from Weitz & Luxenberg and the Real Estate Law Firm, consisting of the following:

---

[5] Financial records provided by the Real Estate Law Firm for the period up to and including 2005 were incomplete.   Accordingly, it is possible that SILVER obtained even more money from the Real Estate Law Firm than is stated herein.

| Year | Real Estate Law Firm | Weitz & Luxenberg | | | | Grand Total |
|---|---|---|---|---|---|---|
| | Referral Fees | Asbestos Referral Fees | All Other Referral Fees | Salary | W&L Total | |
| 2002 | Incomplete Records | $0 | $0 | $37,384.66 | $37,384.66 | $37,384.66 |
| 2003 | Incomplete Records | $0 | $0 | $120,000.00 | $120,000.00 | $120,000.00 |
| 2004 | At least $3,606.17 | $0 | $0 | $120,000.00 | $120,000.00 | $123,606.17 |
| 2005 | At least $159,876.90 | $328,348.31 | $0 | $120,000.00 | $448,348.31 | $608,225.21 |
| 2006 | $14,238.18 | $300,723.98 | $16,956.81 | $120,000.00 | $437,680.79 | $451,918.97 |
| 2007 | $0 | $140,733.98 | $0 | $120,000.00 | $260,733.98 | $260,733.98 |
| 2008 | $806.81 | $239,313.57 | $284,357.82 | $120,000.00 | $643,671.39 | $644,478.20 |
| 2009 | $14,086.45 | $198,157.83 | $0 | $120,000.00 | $318,157.83 | $332,244.28 |
| 2010 | $73,134.45 | $570,017.75 | $38,973.80 | $120,000.00 | $728,991.69 | $802,126.00 |
| 2011 | $240,994.86 | $498,223.12 | $63,631.21 | $120,000.00 | $681,854.47 | $922,849.19 |
| 2012 | $104,356.82 | $206,007.77 | $5,047.70 | $120,000.00 | $331,055.61 | $435,412.29 |
| 2013 | $39,095.67 | $357,520.65 | $197,573.06 | $120,000.00 | $675,317.85 | $714,189.38 |
| 2014 | $35,317.32 | $440,605.75 | $21,591.80 | $120,000.00 | $582,197.55 | $617,514.87 |
| Grand Total | $685,513.63 | $3,279,652.71 | $628,132.20 | $1,477,384.66 | $5,385,169.57 | $6,070,683.20 |

27.   As set forth above and explained in more detail herein, I respectfully submit that there is probable cause to believe that SHELDON SILVER, the defendant, obtained approximately $4 million of the income described above in exchange for his corrupt and secret use of his official position through at least two different means and methods: (i) steering real estate developers with significant and continuing business before the State to the Real Estate Law Firm, in exchange for kickbacks paid to him by CC-1 for such referrals; and (ii) soliciting and obtaining referrals at Weitz & Luxenberg from Doctor-1 in return for directing State grants to Doctor-1's research and undertaking other official actions on behalf of Doctor-1 and his family.

**SILVER'S CORRUPT ARRANGEMENT WITH THE REAL ESTATE LAW FIRM**

28.   I respectfully submit that there is probable cause to believe that the payments from the Real Estate Law Firm disguised as attorney "referral fees" and not reported by SHELDON SILVER, the

defendant, in his Disclosure Forms, are, in truth and in fact, corrupt kickbacks from the Real Estate Law Firm to SILVER in exchange for SILVER'S improper use of his official position to induce real estate developers who had and continue to have significant business before SILVER and the State to retain and continue to retain the Real Estate Law Firm.

29.   I have learned the following from representatives of the New York City Tax Commission (the "Tax Commission") and an attorney with the Real Estate Law Firm ("Attorney-1"),[6] a review of documents obtained from the Real Estate Law Firm, and my training, experience, and participation in the investigation:

a.   While certain regulatory and taxation matters and public subsidy programs are controlled entirely by the State, to the extent not controlled by the State, taxation of buildings in the City of New York (the "City") is controlled by City government.

b.   Owners of properties in the City can contest their property taxes in multiple ways.  Among other things, owners can ask the City's Department of Finance for a reduced assessment, which serves as a basis for taxes imposed.  Owners also can file what is known as a tax certiorari application with the Tax Commission contesting the assessment.

c.   Specialized law firms and law practices often handle real estate tax certiorari work.  Tax certiorari attorneys typically bill on a contingency fee basis and thus receive a percentage of any reduction in taxes obtained as a result of tax certiorari petitions or lawsuits filed on behalf of their clients.

d.   CC-1 is an attorney who previously served as counsel to SHELDON SILVER, the defendant, in the Assembly and who founded and controls the Real Estate Law Firm, the practice of which consists almost exclusively of real estate tax certiorari work.  Like others in the tax certiorari industry, the Real Estate Law Firm bills its clients on a contingency fee basis, typically obtaining as a fee up to 25 percent of any tax reductions it obtains on behalf of its clients.  The Real Estate Law Firm only has two attorneys who work for it, namely, CC-1 and Attorney-1.

---

[6] Attorney-1 has provided information to the Government under an immunity order pursuant to which Attorney-1's testimony and other statements to the Government cannot be used directly or indirectly in any prosecution of Attorney-1 except in a prosecution for perjury, obstruction of justice, or making false statements.

e.   Developer-1 and Developer-2 both became clients of the Real Estate Law Firm as a direct result of actions taken by SILVER, as described below.   SILVER received a share of all fees that the Real Estate Law Firm received from representing Developer-1 and Developer-2.   The outside income that SILVER was paid by the Real Estate Law Firm consists exclusively of SILVER's share of fees the Real Estate Law Firm obtained through its representation of Developer-1 and Developer-2.

f.   The vast majority of the Real Estate Law Firm's tax certiorari filings relate to smaller properties with low initial valuations and, therefore, little opportunity for significant reductions in taxes and resulting contingency fees.   In contrast, the Real Estate Law Firm's tax certiorari filings on behalf of Developer-1 and Developer-2 are for large properties with high valuations and, thus, larger opportunities for reductions in assessments and contingency fees.   In or about 2011, for example, the Real Estate Law Firm represented approximately 19 properties owned by Developer-1 and Developer-2, constituting less than one percent of all properties represented by the firm that year, yet those 19 buildings contributed more than 31 percent of all revenue obtained by the Real Estate Law Firm that year.

g.   SILVER has no background in real estate tax certiorari work and no experience performing such work.   There is no record of SILVER ever appearing before the Tax Commission.   SILVER in fact performed no work for the Real Estate Law Firm whatsoever, including in connection with the firm's representation of Developer-1 and Developer-2.

h.   The Real Estate Law Firm pays SILVER periodically, often multiple times per year, by check, which is mailed from the Real Estate Law Firm to SILVER at his home address in Manhattan using the United States mail.

30.   I have learned the following from individuals employed by or lobbying on behalf of Developer-1 and Developer-2, including the Lobbyists, and public sources:

a.   Developer-1 is a major real estate developer and owner of luxury rental properties, collectively valued at more than $1 billion.   In connection with these properties, Developer-1 has received substantial subsidies under the 80/20 program and tax abatements under the 421-a program, and the properties are subject

19

to rent regulations that may be adopted or amended by the State.   Due to the overwhelming percentage of its business tied to State programs and regulations, Developer-1 is dependent on the continued existence of legislation and programs favorable to its business.   Accordingly, Developer-1 often negotiates with leaders of State government, including SHELDON SILVER, the defendant; it has retained lobbyists to represent Developer-1 before the Legislature, including the Lobbyists, in part specifically for advocacy to SILVER; and, as described above, it is the largest political contributor in the State.

b.    Legislation governing the 80/20, 421-a, and rent regulation policies and programs, among other policies and programs (collectively, the "Real Estate Legislation") expires periodically, thus requiring the Legislature to renew the Real Estate Legislation in order for the policies and programs to continue.   The Real Estate Legislation is due to expire again in or about June 2015, and negotiations concerning its renewal are expected to begin in the very near future.

31.   I have learned the following from Attorney-1 and my review of records obtained from the Real Estate Law Firm:

a.    Attorney-1 learned from CC-1 that Developer-1 and Developer-2 were referred to the Real Estate Law Firm by SHELDON SILVER, the defendant.   Attorney-1 also was aware that the Real Estate Law Firm paid SILVER 25% of the fees it obtained from Developer-1, and 15% of the fees it obtained from Developer-2.

b.    Attorney-1 was aware of attorney ethics rules that generally require fee share arrangements to be disclosed to clients.   Attorney-1 believes that in or about 2009 the attorney ethics rules were modified to require fee share arrangements to be disclosed to clients in writing.   Prior to 2009, Attorney-1 did not know whether CC-1 had disclosed the firm's fee share arrangements with SILVER to Developer-1 or Developer-2, and Attorney-1 had not made any such disclosures.   In light of Attorney-1's belief, Attorney-1 told CC-1 that the Real Estate Law Firm should draft new retainer agreements with Developer-1 and Developer-2 that explicitly disclosed the fee share arrangements with SILVER.   Nevertheless, over the next approximately two years, neither CC-1 nor Attorney-1 provided new retainer agreements to Developer-1 or Developer-2, nor were the firm's fee share arrangements with SILVER otherwise disclosed to Developer-1 or Developer-2 in writing.

c.   In or about late 2011, Attorney-1 became concerned because Attorney-1 believed that the legislative disclosure rules had changed such that SILVER might soon report on his financial disclosure forms that he received outside income from the Real Estate Law Firm, and Attorney-1 wanted the Real Estate Law Firm's documents to be in order in the event of scrutiny. Thereafter, in or about January 2012, the Real Estate Law Firm drafted retainer agreements for Developer-1 and Developer-2 that disclosed the Real Estate Law Firm's fee share arrangements with SILVER.

32.   I have learned the following from representatives of and lobbyists for Developer-1, including the Lobbyists, and Attorney-1, and documents obtained from Developer-1 and the Real Estate Law Firm:

a.   Developer-1 owns several buildings in the Assembly District of SHELDON SILVER, the defendant, as well as buildings that benefit from the 80/20 and 421-a programs.  By at least in or about 2000, SILVER, in part through contact with the Lobbyists, had referred Developer-1 to the Real Estate Law Firm to be retained for tax certiorari work for some of Developer-1's buildings.  Prior to this retention, Developer-1 had retained law firms other than the Real Estate Law Firm for its tax certiorari work, but in light of the significant business Developer-1 had before the State and to accommodate SILVER's request, Developer-1 agreed to move some of its tax certiorari business to the Real Estate Law Firm.  Over time, and with SILVER's knowledge, Developer-1 gave additional business to the Real Estate Law Firm, so that by 2011, the Real Estate Law Firm represented approximately 15 of Developer-1's buildings.

b.   In or about January 2012, the Real Estate Law Firm sent retainer agreements to Developer-1 that disclosed in writing that the Real Estate Law Firm was sharing its fees from Developer-1 with SILVER, and stated that SILVER was jointly representing Developer-1 with the Real Estate Law Firm in tax certiorari matters.  SILVER had not disclosed to Developer-1 previously that the Real Estate Law Firm had paid him a share of the fees that Developer-1 had paid to the Real Estate Law Firm.

c.   Developer-1 refused to sign the retainer agreements as written.  However, after discussions through at least one of the Lobbyists with SILVER, including a meeting between that Lobbyist and SILVER in SILVER's legislative office, it was determined that while the primary retainer agreements would not contain any reference to SILVER, Developer-1 would sign a side letter (the "Side

Letter") concerning the Real Estate Law Firm's arrangement with SILVER.   The Side Letter was addressed to SILVER and stated, in relevant part, that the purpose of the letter "is to acknowledge that you have assumed joint responsibility with our firm" for representation of Developer-1's properties, and that "as agreed," SILVER would receive a "proportionate division of fees."   SILVER, CC-1, and an authorized signatory of Developer-1 each signed the Side Letter.   Following the Side Letter's signature by SILVER, CC-1, and Developer-1, Developer-1 continued to have business before the State, including before SILVER, and continued to retain the Real Estate Law Firm, and the Real Estate Law Firm continued to pay SILVER a portion of the fees it was paid by Developer-1.

       d.   Immediately prior to the Real Estate Law Firm's written disclosure to Developer-1 of its fee share with SILVER, in or about December 2011, SILVER contacted one of the Lobbyists to ask, in sum and substance, whether – in connection with the Lobbyist's activities lobbying SILVER with regard to legislation and other matters before the Assembly – the Lobbyist was acting on behalf of Developer-1 or "the LLCs" that nominally owned the buildings ultimately owned by Developer-1.   The Lobbyist replied that he represented Developer-1.   In response, SILVER indicated, in sum and substance, that there was nothing to worry about, because he (i.e., SILVER), was only representing the LLCs.   Immediately after receiving this call, the Lobbyist contacted Developer-1 through another of its lobbyists because, in light of Developer-1's business before the State, he was concerned and surprised that SILVER appeared to have been getting money from Developer-1 through the Real Estate Law Firm.[7]

       33.   I have learned the following from representatives of Developer-2 and from Attorney-1, as well as from documents obtained from Developer-2 and the Real Estate Law Firm:

       a.   Developer-2 is a real estate developer that owns several properties in the Assembly District of SHELDON SILVER, the defendant, and whose business is in part dependent on State

---

[7] The Lobbyist who provided this information has entered into an agreement with the USAO SDNY that confirms his status as a fact witness, states that he will not be prosecuted for the conduct described herein, and obligates him to provide truthful information to and cooperate with the Government.   I believe that the information attributed to this individual herein is reliable because, among other things, it is corroborated by multiple other sources of evidence.

governmental approvals for State tax abatement programs and other
official actions taken by State officials, including SILVER.

        b.    In or about 2005, SILVER asked the owner of
Developer-2 to hire the Real Estate Law Firm.  SILVER stated, in sum
and substance, that SILVER would appreciate it if Developer-2 would
retain the Real Estate Law Firm for tax certiorari work on
Developer-2's buildings.  SILVER did not inform the owner of
Developer-2 that if Developer-2 retained the Real Estate Law Firm,
SILVER would receive a share of any fees Developer-2 paid to the Real
Estate Law Firm.  In light of the significant business Developer-2
had before the State, Developer-2 accommodated SILVER's request and
moved certain of its tax certiorari business from other law firms
to the Real Estate Law Firm.

        c.    In or about 2014, CC-1 contacted Developer-2 and
disclosed to Developer-2 that the fees Developer-2 had been paying
to the Real Estate Law Firm were being shared with SILVER.  This was
the first time Developer-2 learned of SILVER's fee share with the
Real Estate Law Firm, and the owner of Developer-2 was extremely
concerned about SILVER's receipt of its money, in part because of
potential legal and ethical issues created by SILVER's receipt of
funds from Developer-2.

        34.    I have learned from Attorney-1, who performs the vast
majority of the Real Estate Law Firm's work for Developer-1 and
Developer-2, that SILVER did not perform any legal work for
Developer-1 or Developer-2.  I also learned from Attorney-1 and my
review of attorney disciplinary rules that an attorney is permitted
to receive referral fees from a law firm not employing that attorney
only in limited circumstances.  In particular, at least since in or
about 2009, Rule 1.5(g) of the New York Rules of Professional Conduct
prohibited division of fees with a lawyer who is "not associated in
the same law firm" unless, among other things, "the division is in
proportion to the services performed by each lawyer or, by a writing
given to the client, each lawyer assumes joint responsibility for
the representation," and "the client agrees to employment of the
other lawyer after a full disclosure that a division of fees will
be made, including the share each lawyer will receive, and the
client's agreement is confirmed in writing."  Even before 2009,
client consent was required, as was a written disclosure if the
division of fees was not in proportion to the services performed by
each lawyer.  Under these rules, I respectfully submit that SILVER,
who was not associated with the Real Estate Law Firm, was not
permitted to earn attorney referral fees because he had no

23

responsibility for the legal representation of Developer-1 or Developer-2, had performed no services for these clients, and with the exception of the side letter referenced above, had never acknowledged in writing that he played any role in the representation or shared any fees with the Real Estate Law Firm.

35.   I have learned the following from individuals employed by or lobbying on behalf of Developer-1, including the Lobbyists, my review of records obtained from the Moreland Commission, and public sources:

a.   In or about 2011, when the Real Estate Legislation was last up for renewal, the Lobbyists met, on behalf of Developer-1, with SILVER in his State office to advocate for certain proposed terms for the new Real Estate Legislation.   The legislation that was enacted included Developer-1's recommendations in substantial part.

b.   A document obtained by the USAO SDNY from the Moreland Commission, which was prepared by an entity that represents real estate developers, stated in connection with the 2011 rent regulation reauthorization that SILVER was considerably more favorable to the real estate industry than expected.   Specifically, the document states that "though he [SILVER] may never be the owners['] advocate, given that the Governor wanted [certain proposals] off the table and wanted to restore his reputation with tenants, it would appear that he (Silver) could have successfully pushed for more."

### SILVER'S CORRUPT RECEIPT OF ASBESTOS REFERRAL FEES

36.   I respectfully submit that there is probable cause to believe that SHELDON SILVER, the defendant, obtained another stream of corrupt payments by soliciting and obtaining asbestos client referrals from Doctor-1 in exchange for directing State grants to Doctor-1's research and undertaking other official actions on behalf of Doctor-1 and his family.

37.   I have learned the following, in sum and substance, from Doctor-1,[8] current and former DOH employees, and current and

---

[8] Doctor-1 has entered into an agreement with the USAO SDNY under which he will not be prosecuted for the conduct described herein, and that obligates him to provide truthful information to and cooperate with the Government.   I believe that the information attributed to Doctor-1 herein is reliable because, among other things, it is corroborated by multiple other sources of evidence.

former employees of University-1 and its affiliated hospital and from documents obtained from Doctor-1, University-1 and its affiliated hospital, DOH, and the Office of the New York State Comptroller ("OSC"), and from my training, experience, and participation in the investigation:

          a.    Doctor-1 is a well-known expert in the field of mesothelioma treatment and research. Doctor-1 treats mesothelioma patients and conducts mesothelioma research at University-1 and its affiliated hospital. By at least in or about 2002, Doctor-1 created a center at University-1 that was dedicated to mesothelioma research (the "Mesothelioma Center"). Because of his expertise, Doctor-1 treats many patients who come from outside the State.

          b.    Compared to most other forms of cancer, there is little funding for mesothelioma research, in part because the disease is rare, affecting only approximately 3,500 patients per year in the United States, and survival rates are low.

          c.    As funding is relatively scarce, certain mesothelioma researchers, including Doctor-1, have sought and received funding from law firms (or their affiliated foundations) that have earned large legal fees from the representation of individuals who suffer from mesothelioma. For many years, Doctor-1 served as a member of the scientific advisory board of a not-for-profit organization (the "Asbestos Organization") that sought and received such law firm funding for mesothelioma research. Doctor-1 knew from his work with the Asbestos Organization that Weitz & Luxenberg did not, as of 2003, financially support mesothelioma research.

          d.    Doctor-1 knew SHELDON SILVER, the defendant, through a mutual friend (the "Mutual Friend") who had worked in Albany and was friendly with SILVER.

          e.    Doctor-1 never had referred patients to Weitz & Luxenberg before SILVER joined the firm in 2002 in part because Doctor-1 believed the firm should support mesothelioma research and it had not done so.

          f.    Soon after learning that SILVER had joined Weitz & Luxenberg, Doctor-1 asked SILVER if Weitz & Luxenberg would fund mesothelioma research, and SILVER responded, in sum and substance, that the firm would not. Doctor-1 also informed SILVER, in sum and substance, that firms that represented patients with

asbestos-related diseases should financially support related
medical research.   Thereafter, Doctor-1 learned that SILVER wanted
Doctor-1 to refer asbestos patients to SILVER at Weitz & Luxenberg.

g.   Based on SILVER's request, Doctor-1 began to
refer patients to SILVER at Weitz & Luxenberg.  By making and
continuing to make referrals to SILVER at Weitz & Luxenberg, Doctor-1
intended to create and maintain a relationship with SILVER through
which Doctor-1 could and did make requests of and receive benefits
from SILVER in his official capacity as Speaker of the Assembly,
including State funding for Doctor-1's research.

h.   Soon after Doctor-1 began referring patients to
SILVER, SILVER communicated to Doctor-1, in sum and substance, that
State funds potentially were available for Doctor-1's research and
instructed Doctor-1 to write a letter to SILVER requesting State
funds.

i.   Pursuant to SILVER's suggestion, Doctor-1
drafted a letter to SILVER in which Doctor-1 requested that the State
provide $250,000 to the Mesothelioma Center that Doctor-1 had
established at University-1.  Computer records show that the first
draft of this letter was written on December 29, 2003, which Weitz
& Luxenberg's records show was approximately seven weeks after
Doctor-1 made his first patient referral to SILVER at Weitz &
Luxenberg.  The letter was addressed to SILVER at SILVER's District
Office in lower Manhattan and was dated January 7, 2004.

j.   After Doctor-1 had made initial referrals to
SILVER, SILVER instructed Doctor-1 not to tell the Mutual Friend
about the cases Doctor-1 was referring to SILVER.

k.   On or about July 5, 2005, by letter from SILVER
on Assembly letterhead sent to DOH, SILVER directed that a State grant
in the amount of $250,000 be awarded to Doctor-1's Mesothelioma
Center.   In the letter, SILVER directed that the grant be paid for
from the HCRA-Assembly Pool.  The Legislative Initiative Form that
accompanied the letter stated that the State money would support the
general operating expenses of Doctor-1's Mesothelioma Center and
attributed the request for funds, in part, to the need to study
mesothelioma as result of the release of asbestos into the air on
September 11, 2001 and for related outreach to residents of lower
Manhattan, which is in SILVER's Assembly district.   Neither the
letter nor the accompanying Legislative Initiative Form mentioned

the fact that SILVER was benefiting financially from referrals of patients by Doctor-1 to SILVER.

l.      On or about July 12, 2005, Doctor-1 was informed by DOH that University-1's affiliated hospital had been awarded a State grant in the amount of $250,000 for the Mesothelioma Center (the "First $250,000 State Grant").   The First $250,000 State Grant was for the time period July 1, 2005 through June 30, 2006 and was funded through the HCRA-Assembly Pool.   As with other disbursements from the HCRA-Assembly Pool, DOH did not review the merits of the grant but simply processed the grant-related paperwork, including the grant contract and vouchers seeking payment against the grant.

m.      Based on Doctor-1's discussions with SILVER, in or about April 2006 and again in or about October 2006, Doctor-1 wrote letters to SILVER in which Doctor-1 requested an additional $250,000 in State funding for Doctor-1's Mesothelioma Center.

n.      On or about November 30, 2006, again by letter from SILVER on Assembly letterhead to DOH and accompanied by another Legislative Initiative Form, SILVER directed that a number of entities receive distributions from the HCRA-Assembly Pool.   Among the entities to which SILVER directed DOH to allocate funding from the HCRA-Assembly Pool was the Mesothelioma Center, in the same amount as the first State grant: $250,000.   The accompanying Legislative Initiative Form contained language identical to the Legislative Initiative Form that accompanied the July 2005 letter, including its reference to the use of funds to support research related to September 11 and outreach to residents and workers in lower Manhattan.

o.      On or about March 20, 2007, Doctor-1 was informed by DOH that University-1 had been awarded another State grant in the amount of $250,000 for the Mesothelioma Center (the "Second $250,000 State Grant").   The Second $250,000 State Grant was for the time period July 1, 2007 through March 31, 2008 and also was funded through the HCRA-Assembly Pool.   DOH issued and administered the Second $250,000 State Grant in the same manner as the First $250,000 State Grant.

p.      Despite the alleged connection between the $500,000 disbursed to the Mesothelioma Center and the events of September 11, which occurred in SILVER's Assembly district, SILVER never asked Doctor-1 how the State funds he had directed to the Mesothelioma Center actually were used.   I have been unable to locate

27

any public announcement or disclosure by SILVER of the State
disbursements to the Mesothelioma Center.  As set forth above,
SILVER was not required to disclose disbursements from the
HCRA-Assembly Pool because the fund was, during its existence,
off-budget or budgeted as a lump-sum appropriation whose ultimate
beneficiaries were not required to be publicly disclosed.

      q.    After the $500,000 in State funds had been
received, Doctor-1 engaged in continued communications with SILVER
about obtaining yet additional State funding for Doctor-1's
research.  SILVER ultimately informed Doctor-1, in sum and
substance, that the program under which the $500,000 in State grants
to the Mesothelioma Center had been awarded had ended.[9]

      r.    Commencing in or about 2010, Doctor-1 began
receiving substantial support for his mesothelioma research from a
foundation associated with another asbestos firm (the "Other
Asbestos Firm"), which, like Weitz & Luxenberg, represented clients
who suffered from mesothelioma.  By the time Doctor-1 began to
receive funding from the Other Asbestos Firm, SILVER had directed
no recent State funding to the Mesothelioma Center.  In part because
the Other Asbestos Firm was providing funding for his research,
Doctor-1 began referring cases to the Other Asbestos Firm.

      s.    After Doctor-1 began to refer cases to the Other
Asbestos Firm, SILVER visited Doctor-1 at University-1 and asked him
why the number of patient referrals to him had decreased.  In
response, Doctor-1 informed SILVER, in sum and substance, that he
had fewer patients who were looking for legal representation, and
that he had been referring patients who sought legal representation
to the Other Asbestos Firm, which was supporting his research.

      t.    Despite the relationship with the Other
Asbestos Firm, Doctor-1 continued to refer cases to SILVER at Weitz
& Luxenberg, including after 2010.  Doctor-1 made these referrals,
in part, to maintain a relationship with SILVER through which
Doctor-1 could and did make requests of and receive benefits from
SILVER in his official capacity as Speaker of the Assembly, and SILVER

---

[9] Based on information set forth above, I know that SILVER's statement
to Doctor-1 that the program under which the $500,000 was disbursed had ended
coincided with the elimination of the HCRA-Assembly Pool and other lump-sum
appropriations in 2007.  Nothing prohibited SILVER after that date from disbursing
itemized appropriations in the form of publicly identifiable member items to the
Mesothelioma Center.  Any such member items, however, unlike the appropriations
from the HCRA-Assembly Pool, would have been subject to public disclosure.

in turn used his official position to provide certain benefits to Doctor-1 and his family, including, but not limited to, the following:

i.   In or about 2008, SILVER helped direct $25,000 in State funding to a not-for-profit organization on which a family member of Doctor-1 served as a member of its Board of Directors.   In or about May 2008, the organization thanked Doctor-1 and his family member for their help "obtaining funds from Assemblyman Silver."

ii.   In or about May 2011, SILVER sponsored and obtained an official resolution issued by the Legislature honoring Doctor-1, which SILVER presented to Doctor-1 at an event held by a nationwide cancer organization in Manhattan.   During the presentation, SILVER made remarks in his official capacity praising Doctor-1.

iii.   In or about 2012, Doctor-1 contacted SILVER to request that SILVER assist another family member of Doctor-1 in finding a job.   SILVER helped arrange for Doctor-1's family member to be interviewed by a not-for-profit organization (the "Nonprofit Organization") that received millions of dollars in member items and capital funding from SILVER.   I have learned from the head of the Nonprofit Organization that when SILVER asked for help in securing a job for Doctor-1's family member, it was the first and only time SILVER asked the Nonprofit Organization to consider hiring anyone.   Following SILVER's referral, Doctor-1's family member was hired by the Nonprofit Organization.

### SILVER's Personal Financial
### Benefits from His Official Acts for Doctor-1

38.   I have learned the following from the two founding partners of Weitz & Luxenberg ("Partner-1" and "Partner-2"), the attorneys who lead Weitz & Luxenberg's asbestos practice (the "Asbestos Attorneys"), and the firm's Managing Attorney (collectively, the "Weitz & Luxenberg Attorneys"), and from records of Weitz & Luxenberg:

a.   Weitz & Luxenberg is a law firm with its primary offices located in Manhattan.   The firm specializes in representing plaintiffs in mass tort cases, with a particular focus on cases involving asbestos exposure and mesothelioma, and it files hundreds of asbestos exposure and mesothelioma cases in New York each year.

29

b.    Weitz & Luxenberg derives more than 60 percent of its revenue from asbestos cases, with mesothelioma being among the most lucrative of those cases because of, among other things, the disease's clear causal link with asbestos exposure, pain and suffering caused by the disease, the availability of funds to compensate plaintiffs suffering from the disease, and Weitz & Luxenberg's expertise.

c.    In or about September 2002, SHELDON SILVER, the defendant, was hired by Weitz & Luxenberg as "of counsel" at an annual salary of $120,000.  At the time SILVER joined Weitz & Luxenberg, SILVER had no prior experience with asbestos cases, and he brought no cases, matters, or clients of any kind with him to the firm.

d.    According to Partner-1, Weitz & Luxenberg hired SILVER, and paid him $120,000 per year in base compensation, because of his official position and stature and without the expectation that SILVER would perform any work on cases or refer any cases to the firm. Specifically, Partner-1 hoped that Weitz & Luxenberg's association with SILVER would increase the firm's prestige and perceived power. Neither Partner-1 nor Partner-2 knew SILVER well before SILVER joined Weitz & Luxenberg in 2002.

e.    As it provided to other non-partner attorneys, Weitz & Luxenberg provided SILVER with the opportunity to obtain additional income through referral fees.  Accordingly, SILVER was entitled to receive 33 percent of the firm's share of any recovery obtained on behalf of an asbestos-related client whom SILVER referred to the firm, and up to 50 percent of the firm's share of any recovery obtained on behalf of any negligence client whom SILVER referred to the firm.

f.    Soon after SILVER joined Weitz & Luxenberg, SILVER began receiving referrals of asbestos cases from Doctor-1, and he has received numerous referrals of asbestos cases from Doctor-1 since that time.

g.    Except for one or two isolated referrals, the Weitz & Luxenberg Attorneys are unaware of any source of asbestos-related referrals to SILVER other than Doctor-1.  Prior to referring patients to SILVER, Doctor-1 had not referred any patients to Weitz & Luxenberg.

h.   The Weitz & Luxenberg Attorneys did not know how it came about that Doctor-1 began and continued to refer patients to SILVER.   SILVER never told the Weitz & Luxenberg Attorneys that he was going to allocate, or had allocated, any State funding to Doctor-1's research or to asbestos-related research generally.   Nor did SILVER ever state to the Weitz & Luxenberg Attorneys that he had taken or was taking any action to benefit Doctor-1 or his family.

i.   Several years ago, Partner-2 noticed that the number of asbestos-related referrals that SILVER was receiving from Doctor-1 had decreased.   Partner-2 inquired with SILVER, who stated, in sum and substance, that the Other Asbestos Firm had contributed money to Doctor-1's research, and that, as a result, Doctor-1 had begun referring patients to the Other Asbestos Firm.   SILVER further informed Partner-2 that he was confident that Doctor-1 would continue to refer additional patients to him, although he did not explain the source of this confidence.

j.   Until in or about 2011, Weitz & Luxenberg, and Partner-1 and Partner-2 personally, contributed only nominal amounts to mesothelioma research.   Neither Weitz & Luxenberg, nor the firm's attorneys, ever have contributed to Doctor-1's research.

k.   When SILVER received an asbestos referral, he contacted one of the Asbestos Attorneys to provide the potential client's name, phone number, and, in some cases, a brief description of the matter.   The firm then contacted the individual named in the referral by telephone from the firm's offices in Manhattan to evaluate the case.   Several of these telephone calls were interstate telephone calls.   After clients retained Weitz & Luxenberg, they engaged in regular contact with the firm by interstate telephone calls (with respect to the out-of-state clients) If the individual became a client of the firm, SILVER received referral fee credit.

l.   SILVER did not evaluate or perform work on asbestos cases, including clients he referred to Weitz & Luxenberg through Doctor-1, because, among other reasons, he lacked the knowledge and experience necessary to evaluate those cases.   SILVER had no known contact with clients in asbestos cases, and he did not consult with the Weitz & Luxenberg Attorneys about asbestos cases, other than on limited occasions to ask about the status of specific cases and payouts therefrom.

m.   Other than the single matter representing a legislative employee referenced above, SILVER has not performed any

31

substantive legal work at Weitz & Luxenberg, including on those matters that he refers to the firm.

n.    SILVER is given referral fee credit, and receives referral fees multiple times per year, by check based on asbestos cases referred to the firm by Doctor-1.  SILVER received his first referral attributable to Doctor-1 in or about November 2003.  SILVER began receiving referral fees from asbestos cases in or about February 2005.  Records reflect that SILVER has received and continues to receive referral fees arising from asbestos referrals, the most recent one of which I am aware being in or about November 2014.

o.    The dollar amount of asbestos referral fees paid to SILVER by Weitz & Luxenberg likely is to increase because several of the asbestos cases referred to SILVER by Doctor-1 have not yet been fully resolved.

### SILVER'S EFFORTS TO CONCEAL HIS CORRUPT SOURCES OF OUTSIDE INCOME FROM THE PUBLIC AND THE MORELAND COMMISSION

39.    Based on the information set forth above, I respectfully submit that the representations of SHELDON SILVER, the defendant, to the public in his Disclosure Forms and in public statements about the sources of his outside income consistently have been materially false and misleading in that, among other things, SILVER failed to disclose that he was receiving income from the Real Estate Law Firm; failed to disclose that the vast majority of his income from Weitz & Luxenberg was derived from asbestos cases on which he performed no legal work and that he received through the use of his official position rather than because of any potential client's interest in having SILVER represent him or her; and failed to disclose that his clients at the Real Estate Law Firm have had and continue to have business before the State.  In addition, SILVER made numerous affirmative misrepresentations about the nature of his private law practice and the sources of his outside income as described in greater detail above.

40.    In addition to concealing his corrupt sources of outside income from the public, SHELDON SILVER, the defendant, also took actions to conceal his corrupt sources of outside income from the Moreland Commission.  I have learned the following from my review of publicly available State government documents and State court filings and records received by the USAO SDNY from the Moreland Commission and from members of the Moreland Commission and its staff,

representatives of the Office of the Governor, and the Weitz &
Luxenberg Attorneys, and from my training, experience, and
participation in the investigation:

a.    On or about July 2, 2013, the Governor of the
State appointed the Moreland Commission.  According to the
Governor's public statements announcing the formation of the
Moreland Commission, the Moreland Commission was established "to
probe systemic corruption and the appearance of such corruption in
state government, political campaigns and elections in New York
State."  The Governor's press release specifically stated that the
Commission would "have the power to subpoena and examine witnesses
under oath as well as subpoena any necessary records."  The
Commission was scheduled to last approximately 18 months and issue
a "preliminary policy report" on December 1, 2013 and "any additional
report(s)" by January 1, 2015.

b.    Part of the Moreland Commission's investigation
included outside income earned by members of the Legislature.  In
connection with that facet of its investigation, the Moreland
Commission wrote letters to members of the Assembly and the Senate,
including SHELDON SILVER, the defendant, requesting, among other
things, "a description of the services you provide or have provided
in exchange for compensation," and "a list of your clients in any
civil matters."  While some legislators voluntarily complied with
the request, SILVER refused to do so.  After SILVER refused to comply
with the letter request, the Moreland Commission subpoenaed Weitz
& Luxenberg, as well as other entities that employed legislators who
had refused to comply with the letter requests, for information about
the non-complying legislators' outside income.

c.    The subpoena to Weitz & Luxenberg specifically
sought records concerning "CLIENTS advised or represented by
Assembly Speaker Sheldon Silver, and a general description of the
services provided by Assembly Speaker Sheldon Silver to such
CLIENTS."  (Emphasis in original.)

d.    After Weitz & Luxenberg received the Moreland
Commission subpoena, SILVER caused the Assembly to file a motion in
New York State Supreme Court to quash the Moreland Commission's
subpoenas related to Assembly Members' outside income, including the
subpoena to Weitz & Luxenberg.  This and other legal actions by the
Assembly to quash the subpoenas were taken at taxpayers' expense.
Weitz & Luxenberg, after discussions with SILVER, also filed its own
motion to quash the subpoena.  The Moreland Commission filed a

response asking that the court order the subpoenaed entities, including Weitz & Luxenberg, to produce to the Moreland Commission the requested documents related to outside income.

e.   On or about February 25, 2014, in statements made at a press conference, SILVER claimed that by subpoenaing information about legislators' outside income, the Moreland Commission was "engaged in a fishing expedition to intimidate legislators" and had exceeded its mandate and otherwise abused its power.

f.   On or about March 29, 2014, the Governor announced that, as part of the budget negotiations, he had agreed to end the Moreland Commission, and in exchange, the Legislature had agreed to certain changes to campaign finance reporting requirements and bribery laws, and to experiment with public financing of elections in that year's race for State Comptroller.   SILVER and his Assembly staff were key participants in these negotiations and prior discussions of these issues, including advocating against the Moreland Commission's formation and continued existence and arguing against limits to legislators' outside income and related disclosure requirements.   At the time of the Governor's announcement, the motions to quash the Moreland Commission subpoenas relating to outside income as described above were pending.   No changes were made with respect to the ability of legislators to receive outside income or with respect to the disclosures required about the nature of such outside income.

g.   On or about April 10, 2014, the USAO SDNY requested and received from the Moreland Commission its files and documents, including documents related to its investigation of legislators' outside income.   Certain of these documents and leads contained therein are reflected in this Complaint.

41.   On or about April 22, 2014, the New York State Attorney General, on behalf of the Moreland Commission, filed a letter in New York State Supreme Court withdrawing the subpoenas related to outside income and requesting that the pending motions be dismissed, citing the fact that the Governor had disbanded the Commission and its staff.

42.   Based on the evidence set forth above, I respectfully submit that there is probable cause to believe that SHELDON SILVER, the defendant, has engaged in and continues to engage in a secret and corrupt scheme to deprive the citizens of the State of his honest services, and to extort individuals and entities under color of official right, and has conspired to do the same, in violation of Title 18, United States Code, Sections 1341, 1343, 1346, 1349, and 1951.

WHEREFORE, deponent respectfully requests that a warrant be issued for the arrest of SHELDON SILVER, the defendant, and that he be imprisoned or bailed, as the case may be.


_____
ROBERT W. RYAN
Criminal Investigator
United States Attorney's Office
Southern District of New York


Sworn to before me this
21st day of January, 2015

_____
THE HONORABLE FRANK MAAS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK